IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-03004-KLM

HAYNES MECHANICAL SYSTEMS, INC.,

      Plaintiff,

v.

BLUON ENERGY, LLC,

      Defendant.

_____

## ORDER

_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on Plaintiff's **Fed. R. Civ. P. 56 Motion for Partial Summary Judgment and Memorandum in Support** [#49][1] ("Plaintiff's Motion"), and on Defendant's **Motion for Summary Judgment on All Claims Brought by Haynes Mechanical Systems, Inc. in This Action** [#51] ("Defendant's Motion").  Defendant filed a Response [#58] in opposition to Plaintiff's Motion, and Plaintiff filed a Reply [#63].  Plaintiff filed a Response [#62] in opposition to Defendant's Motion, but no Reply was filed.  The Court has reviewed the Motions, the Responses, the Reply, the entire case file, and the applicable law, and is sufficiently advised in the premises.[2]  For the reasons

---

[1] "[#49]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

[2] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties.  See [#22, #24].

set forth below, Plaintiff's Motion [#49] is **GRANTED in part and DENIED in part** and

Defendant's Motion [#51] is **GRANTED in part and DENIED in part**.

## I. Background[3]

The following facts are undisputed.[4]  *See generally Pl.'s Motion* [#49] at 2-6 ¶¶ 1-

16; *Def.'s Motion* [#50] at 3-9 ¶¶ 1-26; *Pl.'s Response* [#62] at 5-10 ¶¶ 1-26; *Def.'s*

*Response* [#58] at 3-10 ¶¶ 1-16; *see also Pl.'s Reply* [#63] at 1-6 ¶¶ 2-16.  Plaintiff is a

mechanical contractor in business since 1968 which provides heating, ventilation, and air

conditioning ("HVAC") services in Colorado.   For generations, HVAC units primarily

operated with a fluid refrigerant known in the industry as R-22.  R-22 is alternatively known

as HCFC-22 and has been trademarked by DuPont as "Freon."   HVAC-R equipment

works by changing R-22 liquid refrigerant into a gas and back again, absorbing and

dispelling heat in the process.  This refrigerant, if released to the atmosphere, has ozone

---

[3]  Because this Order addresses partial cross-motions for summary judgment, only undisputed facts are included in the Background, unless specifically noted.  *See Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyo.*, 889 F.3d 1189, 1195 (10th Cir. 2018) ("Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."); *see also Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004) ("On cross-motions for summary judgment, . . . we must view the inferences to be drawn from affidavits, attached exhibits and depositions in the light most favorable to the party that did not prevail."); *see also Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) ("Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").  To the extent relevant, disputed facts are addressed in the Analysis section below.

[4]  The parties, and especially Plaintiff, sometimes dispute the *implications* of certain otherwise undisputed facts, but the Court addresses the implications underlying these facts, as necessary, in the Analysis portion of this Order.  *See, e.g.*, *Response* [#62] at 6 ¶ 10 (Plaintiff disputing the definition, completeness, and application of the term "retrofit" but not disputing that Mr. Thomas made this statement); *Response* [#62] at 7 ¶ 11 (Plaintiff disputing whether any additional equipment, such as electronic expansion valves, should be implied from Defendant's statement of fact beyond the filter driers actually mentioned by Defendant).

depleting potential.  The United States Environmental Protection Agency ("EPA") has therefore promulgated regulations under the Clean Air Act to phase out R-22.  As of January 1, 2020, the EPA regulations ban any remaining production and import of R-22. As of that date, servicing of systems with R-22 relies on recycled or stockpiled quantities of refrigeration equipment.

In 2016, Defendant began production and sale of a product, TdX 20[5] (also known as R-458A), as a refrigerant alternative to R-22 that would comply with the EPA's mandates concerning next-generation refrigerants for commercial HVAC markets. Defendant represented and marketed to potential purchasers that TdX 20 was the only replacement for R-22 refrigerant that reduced energy consumption, improved performance of existing HVAC in refrigeration systems, decreased carbon footprints, came with a warranty, and was an environmentally safe product.

On June 9, 2016, Mark Hermanson ("Hermanson"), the Southern Colorado General Manager for Plaintiff, emailed Plaintiff's project manager Dale Thomas ("Thomas") and Plaintiff's Southern Colorado salesperson Nat Bushman ("Bushman"), informing them that Plaintiff's existing client Vestas had completed a successful refrigerant exchange in Portland, Oregon, replacing R-22 with Defendant's environmentally safe TdX 20.  Plaintiff had been performing preventative maintenance (including, at a minimum, coil cleanings, auditory-visual inspections, and miscellaneous

---

[5] The parties inconsistently identify this product as "TdX 20" and as "TdX20."  The Court has used "TdX 20" throughout this Order except where "TdX20" appears in quotations from the parties' briefs.

tasks assigned by Vestas' on-site technicians) on the HVAC systems at Vestas since 2011.

In his email, Mr. Hermanson reported that Vestas was interested in converting at least one HVAC unit at its facility in Pueblo, Colorado, from use of R-22 to use of Defendant's TdX 20.  Mr. Hermanson asked if Mr. Thomas or Mr. Bushman had "any concerns about the scope [and/or Plaintiff's] ability to complete [the] project."  Throughout June and July 2016, Mr. Hermanson and Mr. Bushman convinced Ed Sears, a Vestas employee, that Plaintiff was the right contractor for the job, because Plaintiff had "expertise with R-22 phase out, . . . system retrofit and system design."  During this time, Plaintiff's employees also began reviewing the information Defendant provided on its website about TdX 20's capabilities.  In the summer and fall of 2016, representatives of Defendant, including Douglas Reinke, its then-President and Chief Executive Officer, met and discussed the possibility of Plaintiff and Defendant working together to convert the HVAC units at Vestas from R-22 refrigerant to TdX 20.

At various times, Defendant represented that TdX 20 was a "true drop in" replacement that required no equipment changes and "[n]o modifications to the infrastructure or system," that one "[s]imply evacuate[s] the current refrigerant from the unit and re-charge[s] [it] with TdX 20," that it "[r]uns on all R-22 HVAC equipment," and that it "[w]orks with standard metering devices.  No expansion device change is required."[6] These representations are made throughout Defendant's written statements in various

---

[6]  Expansion devices measure refrigerant into the HVAC system.  "[T]hermostatic expansion valves" or "TXV's" (a purely mechanical metering device) and "electronic expansion valves" or "EEVs" (an electronically controllable device that performs the same function as mechanical TXVs) are both "metering devices" as the phrase is used here.

formats, including to the EPA in Defendant's November 7, 2014 Significant New Alternatives Policy (SNAP) application and directly to Plaintiff in the "Conversion Procedure" document Defendant provided to Plaintiff for the Vestas project.

On August 10, 2016, Plaintiff sent Vestas a proposal titled "Bluon R22 Retro Fit Pueblo Facility," for the retrofit of forty-eight HVAC units on two building rooftops for a flat-fee contract price of $430,024.00.  According to Plaintiff's project manager, Mr. Thomas, a "retrofit" is "any time you're taking a piece of equipment and modifying it for some other purpose . . . .  So there is a certain component of that where you're changing the original design of the equipment."  After Vestas received the proposal, Plaintiff intensified discussions about the project with Defendant in August 2016, including discussing whether any additional equipment would be needed to retrofit the systems from R-22 refrigerant to TdX 20.

In October 2016, Defendant's Director of Technical Services and Training, Greg Koenig ("Koenig"), conducted a pre-purchase inspection of the HVAC units at Vestas, held conference calls with Carel (the manufacturer of electronic expansion valves ("EEVs") used on the Vestas project), and engaged in discussions with Defendant.  After this inspection, Mr. Koenig emailed his contacts at Plaintiff's company on October 17, 2016, to express his independent concerns regarding converting the HVAC units at Vestas from R-22 refrigerant to TdX 20.  Two days later, on October 19, 2016, Vestas accepted Plaintiff's August 10 proposal as outlined in the "Bluon R22 Retro Fit Pueblo Facility" document.

On November 3, 2016, Plaintiff prepared a Purchase Order ("PO") for 274 containers of TdX 20 from Defendant.  At the bottom of the PO, Plaintiff inserted three

proposed "warranty" statements, together with a signature line for Plaintiff, and a line for "Vendor Acceptance."  These proposed warranty statements were based on Mr. Koenig's concerns about converting the systems at Vestas to TdX 20.  Neither the November 3, 2016 PO nor any other contractual document between Plaintiff and Defendant contemplated Defendant's employees providing installation, start-up, design, or troubleshooting services on the Vestas project, with the limited exceptions stated at the bottom of the PO.  Similarly, neither the PO nor any other contractual document between Plaintiff and Defendant specified a standard of care for any of Defendant's employees who might provide installation, start-up, design, or troubleshooting services on the Vestas project.

On November 4, 2016, Mr. Hermanson emailed Plaintiff's PO to Defendant and included three proposed warranty statements in the text of the email:

> Thanks for your time this morning.  As discussed, I've attached the PO so that you can start pushing the timeline on the EEVs and also schedule delivery of the TDX20.   Please send the first 50% invoice to accountspayable@haynesmechanical.com.  Currently the delivery address is our shop in Colorado Springs.  After our meeting with Vestas on Monday, we MAY change that to the Vestas site.  I'll update you ASAP if that is the case.

> Additionally, here is the verbiage we are looking to incorporate in a warranty agreement between Haynes and Bluon:

> Bluon Energy LLC ("Bluon) affirms and warrants the following statements regarding the TDX20 conversion:

> 1. Elastomer gaskets don't need to be replaced in the TdX20 conversion to prevent leakage.  Should leaks be discovered due to gaskets failing to seal, Bluon shall provide material and labor credit to repair.

> 2. Adding POE is not required for compressor lubrication.  R-227 emulsion is not a concern for Bluon.  Should mechanical compressor failures occur due to lack of lubrication, Bluon shall provide material and labor credit to repair.

3. Prior to TDX20 conversion, Bluon shall provide Haynes Mechanical Systems with required gas flow velocities for oil return.  Should Bluon not provide this data and oil return becomes an issue, Bluon shall provide material and labor credit to repair.

As we agreed on the phone today, we'd release the PO so that we don't fall too far behind schedule and you would work on coming to terms for a warranty period for these items.

The parties agree that these three proposed warranty statements were incorporated into their final contract.

Defendant's then-employee, Ryan Scanlon ("Scanlon"), responded to Mr. Hermanson by email the same day:

Thanks for the PO, and for your time this morning.  We'll start pushing this through our system, discussing the language below, and communicating with Carel on the EEV's. . . .

If you could also send me a couple times that work for you on Tuesday for us to pick up where we left off regarding the liability language & labor costs, I'll schedule a follow up call.

The Bluon warranty is attached.

The language in the Bluon warranty included the following disclaimer:

BLUON DISCLAIMS ALL EXPRESS WARRANTIES AND ALL IMPLIED WARRANTIES, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. BLUON SHALL HAVE NO LIABILITY TO BUYER, AND/OR CLAIMANT, OR ANY PURCHASER FROM ANY CLAIMANT, FOR DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION, INCIDENTAL OR CONSEQUENTIAL DAMAGES.  NO WARRANTY, EXPRESS, OR IMPLIED, IS EXTENDED TO ANY PERSON OTHER THAN A CLAIMANT. THIS WARRANTY IS NOT ASSIGNABLE, EXCEPT THE BUYER MAY ASSIGN THIS WARRANTY TO A MECHANIC WHO PURCHASES THE PRODUCT FOR REPLACEMENT IN A COMPRESSOR.

*Ex. A, Bluon Energy Product Limited Warranty* ("BEPLW") [#50-1] at 1.[7]   The parties

dispute whether the BEPLW was incorporated into the parties' final contract.

On November 7, 2016, Defendant sent an invoice (dated November 4th) to Plaintiff

for its purchase of TdX 20.  Defendant's invoice requested a total payment of $151,266.42

for 274 containers of TdX 20, with 50% payment up front, and 50% payment on delivery.

Mr. Hermanson initially told his team "Don't pay this."   However, sometime after

November 7, 2016, but before November 22, 2016, Plaintiff made the first payment.  On

November 30, 2016, Defendant's accounting department followed up with Plaintiff

regarding the outstanding payment.  On December 1, 2016, Mr. Hermanson directed

Plaintiff's accounts payable department to pay the outstanding invoice, because by then

Plaintiff had received all 274 containers of TdX 20.  The parties do not dispute that they

formed a contract at some point during this month, although the precise time and date of

contract formation is disputed.

After the Vestas conversion project got underway, Defendant sent various

employee technicians to troubleshoot problems encountered during the conversion

process.  For example, Defendant paid for the purchase and installation of EEVs on the

---

[7]  The Court notes that the parties did not use a unified exhibit identification system, a decision which greatly hampered the Court's ability to efficiently sort through the evidence provided.  No numbers, only letters, were used by both parties to identify exhibits, and nearly every letter has multiple exhibits connected with each particular letter.  For example, Exhibit A may refer to the Rule 30(b)(6) deposition of Plaintiff given by Mr. Hermanson, *see* [#49-1], the BEPLW, *see* [#50-1], the Customized Professional Maintenance Program IV, *see* [#59-1], the deposition of Mr. Hermanson in his personal capacity, *see* [#62-1], or a separate, second excerpt from the Rule 30(b)(6) deposition of Plaintiff, *see* [#63-1].  In the absence of a viable alternative, the Court has used the same letters the parties have used for their exhibits but has generally attempted to untangle the knots by referencing the party who filed the exhibit, the title of the exhibit, and/or the docket entry number.

units at Vestas.  In addition, configuration of the "continuous pump down system" and the installation of new "check valves" were intended to solve a problem of "off cycle migration."  Further, resistors were added to the dampers.[8]  More than a year after the Vestas project began, in December 2017, Plaintiff sent Defendant an invoice itemizing its alleged damages based on these purportedly necessary equipment modifications.  The invoice sought $1,067,634 (not including taxes on materials) consisting of $272,855 in lost opportunity costs and $794,779 in direct costs.  *Ex. T* [#50-20] at 2.

Plaintiff filed this lawsuit on November 21, 2018.  *Compl.* [#1].  Plaintiff asserts six claims against Defendant: (1) breach of express warranties, (2) breach of implied warranty of merchantability, (3) breach of implied warranty of fitness for a particular purpose, (4) unjust enrichment, (5) promissory estoppel, and (6) negligence.  *Am. Compl.* [#6] ¶¶ 57-101.  Defendant asserts one counterclaim against Plaintiff: unjust enrichment.  *Answer & Counterclaim* [#12] at 13.  Both sides seek damages.  *Am. Compl.* [#6] at 15; *Answer & Counterclaim* [#12] at 13.

Regarding Defendant's unjust enrichment counterclaim, the following facts are undisputed.  *See generally Pl.'s Motion* [#49] at 6-8 ¶¶ 17-24; *Def.'s Response* [#58] at 10-11 ¶¶ 17-24; *see also Pl.'s Reply* [#63] at 6 ¶¶ 17-24.  Defendant seeks to recover $52,308 from Plaintiff for the cost of EEVs and related components for the Vestas project.  Defendant also seeks to recover for 628 man-hours of installation and programming of

---

[8]  The parties do not dispute these facts but do dispute whether these modifications were optional or required.

EEVs, at an hourly rate of $150/hour, for a total of $94,200 related to EEV man-hours. The total amount Defendant seeks related to EEVs is $146,508 ($52,308 + $94,200).[9]

Further, according to Plaintiff, and undisputed by Defendant, Defendant's unjust enrichment counterclaim also seeks $97,200 for 648 man-hours "[p]revious to EEVs" at $150/hour.  Defendant adds that Plaintiff's total omitted an additional 16 hours for "pump down" at $150 per hour, totaling $2,400.  *Def.'s Response* [ #58] at 10 ¶ 18.

In addition, Defendant's unjust enrichment counterclaim seeks $23,000 for approximately 400 hours of estimated "remote support" man hours.  Finally, Defendant's unjust enrichment counterclaim seeks additional damages for incidental expenses like air travel and parking, ground transportation, lodging, meals, and miscellaneous supplies related to Defendant's technicians' trips to Pueblo, Colorado, to work on the Vestas conversion project.  Defendant has already voluntarily paid for the EEVs, related components, and Defendant's related labor.  Defendant also voluntarily provided "free, F-R-E-E", all of its labor (on-site and remote), materials, and related costs because it wanted to be the "good Samaritan[ ] of this job" to ensure that the Vestas conversion would be successful and reflect well on its TdX 20 product.

## II.  Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Pursuant to Fed. R. Civ. P. 56(a), summary judgment should be entered if the

---

[9]  Plaintiff states that the amount it believes Defendant is seeking related to EEVs is $148,508, but, as Defendant points out, this appears to be a simple mathematical or typographical error, given that there is no dispute regarding the underlying amounts requested.  *Pl.'s Motion* [#49] at 6 ¶ 17; *Def.'s Response* [#58] at 10 ¶ 17.

pleadings, the discovery, any affidavits, and disclosures on file show "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the case under the governing substantive law.  *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323).  When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Id.* at 671.  If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor.  *See Anderson*, 477 U.S. at 248.  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324).  Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a

denial of an opponent's allegation" or it will be disregarded.  *See* 10B Charles Alan Wright

et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017).

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may

be considered for purposes of summary judgment.  Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]
> . . .
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

### III.  Analysis

The parties agree that, because the Court's jurisdiction is based on diversity of

citizenship, Colorado substantive law applies.  *Macon v. United Parcel Serv., Inc.*, 743

F.3d 708, 713 (10th Cir. 2014)).  *Def.'s Motion* [#50] at 9-10; *see generally Pl.'s Motion*

[#49].

### A.    Breach of Express Warranties

To state a claim for breach of an express warranty, the plaintiff must prove (1) the

existence of a warranty, (2) breach of the warranty, (3) "the breach proximately caused

the losses claimed as damages," and (4) the defendant received timely notice of the

breach.  *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1271 (10th Cir. 2020) (applying

Colorado law).  Plaintiff's claim for breach of express warranties is the only claim on which

both sides seek full or partial entry of summary judgment in their favor in the current Motions. *Pl.'s Motion* [#49] at 2; *Def.'s Motion* [#50] at 10-35. The Court therefore begins its analysis by addressing this claim.

Plaintiff argues that it is entitled to summary judgment on the first, second, and fourth elements of its breach of express warranty claim. *Pl.'s Motion* [#49] at 8-9.[10] Plaintiff explicitly does not seek summary judgment on the third element, conceding that there are issues of fact as to this element which should be reserved for trial. *Id.* at 9 ("This motion seeks partial summary judgment on each element except [whether this breach of warranty caused Haynes' injuries, damages, or losses], reserving the questions of causation and damages for trial."). As far as the Court can discern, Defendant argues that Plaintiff lacks proof of the first, second, and fourth elements of the express warranty claim, and further argues that Plaintiff waived its claim and that the claim fails because the warranty at issue was not the basis of the bargain between the parties. *Motion* [#50] at 10-35.

---

[10] Plaintiff's argument here actually discusses *six* elements, as listed in Colorado Jury Instruction, Civil 14:8, which provides in relevant part:

> For the plaintiff, (name), to recover from the defendant, (name), on (his) (her) (its) claim of breach of express warranty, you must find all of the following have been proved by a preponderance of the evidence: 1. The defendant sold the (insert description of article); 2. The defendant expressly warranted the (description of article) to (insert express warranty claimed by the plaintiff); 3. The plaintiff is a person who was reasonably expected to use, consume or be affected by the (description of article); 4. The (description of article) was not as warranted; 5. This breach of warranty caused the plaintiff (injuries) (damages) (losses); and 6. Within a reasonable time after the plaintiff discovered or should have discovered the alleged breach of warranty, the plaintiff notified the defendant of such breach.

As noted above, the Court relies on a 2020 published case by the Tenth Circuit Court of Appeals applying Colorado law and listing *four* elements to this claim. *See Platt*, 960 F.3d at 1271. However, there appears to be no *material* difference between these two recitations of the elements of this cause of action, and certainly no difference which affects the Court's resolution of Plaintiff's Motion [#49] on this claim, as discussed below.

At the outset, the Court emphasizes that there is no dispute between the parties that they formed a contract, and the Court finds no reason to disturb that conclusion given, in short, that the undisputed facts appear to show that there was a meeting of the minds about such aspects of the contract as product, pricing, and delivery. *See, e.g.*, *Wells Fargo Bank, N.A. v. Mesh Suture Inc.*, No. 19-cv-03218-PAB-GPG, 2021 WL 1207444, at *9 (D. Colo. Mar. 31, 2021) ("Under Colorado law, the primary goal of contract interpretation is to determine and give effect to the intention of the parties.") (citing *Cache Nat'l Bank v. Lusher*, 882 P.2d 952, 957 (Colo. 1994)).  The parties also agree that the three express warranty terms requested by Mr. Hermanson in his November 4, 2016 email to Mr. Scanlon are included in that contract, and the Court likewise sees no reason to disturb that conclusion.  *See id.*

The parties *do* dispute the timing of when the contract was formed, and this informs the issue of which terms were ultimately included in the contract.  Specifically, the parties dispute whether Defendant's standard warranty document, i.e., the BEPLW, was ever incorporated into the contract.  This issue is significant in adjudicating Plaintiff's express warranties claim, because the claim is based on purported express warranties made by Defendant prior to the contract formation (including, specifically, that Defendant "expressly warranted TdX 20 to be a 'drop-in' refrigerant replacement for R-22 that 'requires no equipment modifications'"), while the BEPLW disclaims any such express warranties not explicitly made part of the parties' contract.  *See Motion* [#49] at 8.

In short, Plaintiff argues that the BEPLW did *not* become part of the parties' contract and therefore any other express warranties purportedly made by Defendant were *not* disclaimed.  *Motion* [#49] at 49.  Defendant, on the other hand, argues that Plaintiff's

agreement to buy TdX 20 from Defendant *did* incorporate the BEPLW, which attempts to disclaim all other warranties except for the three warranties explicitly agreed on by the parties, as included in Mr. Hermanson's November 4, 2016 email to Mr. Scanlon. *Motion* [#50] at 12-18. As indicated above, Plaintiff's claim is based on the asserted violation of warranties other than the three explicitly agreed to by the parties; thus, whether the terms contained in the BEPLW (terms which attempted to effectively disclaim all other warranties) were incorporated into the parties' contract is the central issue here.

In Colorado, "the interpretation of an established written contract is generally a question of law for the court," *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986); *see also Aqua-Hot Heating Sys., Inc. v. Gorman-Rupp Co.*, No. 17-cv-01469-RBJ, 2018 WL 6249886, at *3 (D. Colo. Nov. 29, 2018) ("Neither party denies that a contract existed at some point. However, they disagree as to when the contract was formed and which terms govern. Contract interpretation is generally a question of law for the court to decide."). Contract interpretation may become an issue of fact, though, rather than law, with respect to a determination of what is or is not part of a contract. *See United States Welding, Inc. v. TECSYS, Inc.*, No. 14-cv-00778-RBJ-MEH, 2017 WL 4331061, at *2-3 (D. Colo. Aug. 24, 2017). In other words, if the contract is ambiguous about what is or is not a part of the contract, then the issue is one for a jury to decide. *Id.* at *3. In short, the issue should be presented to a jury if there is a genuine issue of material fact regarding what is or is not a part of the contract.

Plaintiff asserts that Colo. Rev. Stat. § 4–2–207 governs issues relating to the formation and terms of the parties' agreement. *Motion* [#49] at 11-12. Defendant does not appear to dispute the applicability of the statute to the Plaintiff's claim for breach of

express warranties.  *Def's Response* [#58] at 14.  Colo. Rev. Stat. § 4–2–207 provides

as follows:

> (1)  A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time, operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract.   Between merchants such terms become part of the contract unless:
> > (a) The offer expressly limits acceptance to the terms of the offer;
> > (b) They materially alter it; or
> > (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received. . . .

Plaintiff argues that Defendant did not condition its acceptance of the PO on Plaintiff's

consent to the BEPLW, and because the BEPLW would materially alter the contract, it

never became part of the parties' agreement.  *Pl.'s Motion* [#49] at 11-12].  Notably, Colo.

Rev. Stat. § 4–2–207(1) requires "[a] *definite* and seasonable expression of acceptance

or a written *confirmation* which is sent within a reasonable time . . . ."  (emphases added).

Ultimately, assuming the applicability of Colo. Rev. Stat. § 4–2–207, the Court finds that

there is a genuine issue of material fact regarding whether the statutory requirements

have been met, thus precluding entry of summary judgment in favor of either party.  As

discussed below, the evidence regarding the Defendant's conduct, and whether it

constituted the required acceptance, is subject to differing interpretations.

Mr. Scanlon, on behalf of Defendant, responded to the PO submitted by Plaintiff

by stating, in relevant part: "Thanks for the PO . . . .  We'll start pushing this through our

system, discussing the language below . . . .  If you could also send me a couple times

that work for you on Tuesday for us to pick up where we left off regarding the liability

language . . . .  The [BEPLW] is attached."  Seen in a light most favorable to Defendant,

this language suggests that Mr. Scanlon was going to "start pushing" the purchase order through company channels so the appropriate personnel could start "discussing the language" to determine whether the Plaintiff's "offer" should be "accepted."   Seen in a light most favorable to Plaintiff, this language suggests that Mr. Scanlon was going to "start pushing" the purchase order through company channels to actually start fulfilling the request for the TdX 20 product.   Thus, because there is a genuine issue of material fact regarding whether Mr. Scanlon's e-mail was a "written confirmation" or other "definite . . . expression of acceptance," the Court finds that it may not determine whether the requirements of  Colo. Rev. Stat. § 4–2–207 have been met on a motion for summary judgment under Fed. R. Civ. P. 56.   Given the ambiguity of the central facts underlying the statutory requirements for acceptance, the Court may not hold as a matter of law that the BEPLW either was or was not incorporated into the parties' contract.   *See, e.g.*, *Schlumberger Tech. Corp. v. Greenwich Metals, Inc.*, No. 07-2252-EFM, 2009 WL 5217358, at *6-7 (D. Kan. Dec. 30, 2009) (holding under similar Kansas law that the parties' cross-motions for summary judgment must be denied "because the Court cannot determine as a matter of law whether Defendant's terms and conditions are part of the contract").

Because there is a genuine issue of material fact regarding whether the BEPLW was incorporated into the contract, the Court finds that entry of summary judgment on the entirety of this claim is inappropriate.   The issue of whether the BEPLW was so incorporated must be determined before adjudication of the remaining elements of a breach of express warranties claim, i.e., whether any valid warranty was breached, and whether the defendant received timely notice of the breach.   (Notably, the BEPLW speaks

to the issue of notice, hence its inclusion or exclusion from the contract is pivotal.)  Thus, the Court finds that entry of summary judgment on this claim is inappropriate.

Regardless of the existence of a factual dispute about the claim for breach of express warranties, Defendant asserts that Plaintiff waived the claim and that summary judgment is appropriate because the alleged warranty at issue was not the basis of the parties' bargain.  Each contention is separately addressed below.

### 1.    Waiver

First, Defendant argues that Plaintiff breached its warranty agreement with Defendant, thereby waiving Plaintiff's warranty claims.  *Motion* [#50] at 28-30.  However, the sole purported legal support to which Defendant directs the Court's attention is *Valley Fresh Produce, Inc. v. Western Skyways, Inc.*, No. 17-cv-01450-PAB-KLM, 2019 WL 4695668, at *15 (D. Colo. Sept. 25, 2019). The legal issue in *Valley Fresh Produce* involved whether the defendants waived their warranty defense by failing to raise it in their Answer; the case does not address whether one party's purported breach of a warranty agreement waives its own warranty claims against the other party.  *Motion* [#50] at 30.

Specifically, the issue here is whether Plaintiff complied with the BEPLW's requirement that "[c]laimant must first seek authorization from BLUON of any repair that would give rise to a warranty claim hereunder."  *Id.* at 28.  Of course, this presumes that the BEPLW was made a part of the contract.  As the Court found above, there is a genuine issue of material fact as to whether this document was ever incorporated as a term of the parties' agreement.  Thus, there is a genuine issue of material fact underlying Defendant's argument here.  Therefore, Defendant's Motion [#50] is **denied** to the extent Defendant

seeks entry of summary judgment in its favor on Plaintiff's breach of express warranty claim based on waiver.

###        2.        Basis of the Bargain

Second, Defendant argues that, even if the Court finds that Defendant's oral statements are enforceable, Plaintiff cannot prevail on a claim for breach of express warranty because Defendant's marketing and sales statements did not form the basis of the bargain between the parties.  *Motion* [#50] at 33-35.

Defendant cites only one case in support of its argument, *Pegasus Helicopters, Inc. v. United Technologies Corp.*, 35 F.3d 507 (10th Cir. 1994).  *Id.* at 33.  In *Pegasus Helicopters*, the Tenth Circuit Court of Appeals noted that "[a]n express warranty can be created by the seller through . . . '[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain,'" Colo. Rev. Stat. § 4–2–313(1)(a) (1992), and that "'[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description,'" Colo. Rev. Stat. § 4–2–313(1)(b).  *Pegasus Helicopters*, 35 F.3d at 511.  In *Pegasus Helicopters*, the defendant argued that the plaintiff "did not present any evidence relating to these internal specifications at trial, and specifically did not establish that [the defendant's] internal specifications were part of the basis of the bargain with Lycoming because there was no evidence that Lycoming even knew of the existence of the specifications."  *Id.* at 512.  The Tenth Circuit held: "Whether or not Lycoming knew the details of what [the defendant's] internal specifications required is immaterial because it is evident that the serviceable tags warranted that the fuel controls were in conformance with those internal specifications, whatever they were, and it is

equally evident that Lycoming was aware of the statements made in the serviceable tags and that those statements were part of the basis of the bargain." *Id.*

Besides its general statements of law, *Pegasus Helicopters* is not on point with Defendant's argument here, which is that even if Defendant's oral warranty statements are enforceable, the Court "should still reject [Plaintiff's] express warranty claims because [Plaintiff] did not rely on any of those statements to form the basis of its bargain with [Defendant]." *Motion* [#50] at 33. While it *may* be true that Plaintiff did not rely on certain statements to form the basis of its bargain with Defendant (a point on which the Court makes no finding), the issue is irrelevant. As Plaintiff thoroughly discusses, regardless of what conduct formed the basis of the bargain, reliance is not required to succeed on a breach of express warranty claim. *See Response* [#62] at 24-26 (citing Colo. Rev. Stat. § 4–2–313, Cmt. 3 ("In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement."); *Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-cv-01398-PAB-KLM, 2013 WL 1900562, at *12 (D. Colo. May 7, 2013) (citing *Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 644-46 (10th Cir. 1991) (holding that statements made in "brochures or other promotional literature" can create an express warranty even in the absence of actual customer reliance")), aff'd, 627 F. App'x 682 (10th Cir. 2015); *Koch v. Kaz USA, Inc.*, No. 09-cv-02976-LTB-BNB, 2011 WL 2607112, at *3 (D. Colo. July 1, 2011) (stating that reliance not required for express warranty); Colo. Jury Instr., Civil 14:8 (containing no reliance element in connection with a claim of breach of express warranty)). Thus, because reliance is not required for Plaintiff to succeed on its claim of

breach of express warranty, the Court finds that Defendant's argument on this point fails. Therefore, Defendant's Motion [#50] is **denied** to the extent Defendant seeks entry of summary judgment in its favor on Plaintiff's breach of express warranty claim based on its basis of the bargain argument.

Accordingly, Plaintiff's Motion [#49] and Defendant's Motion [#50] are both **denied** to the extent both sides seek entry of summary judgment on Plaintiff's breach of express warranties claim.

### B.   Breach of Implied Warranty of Merchantability

Defendant seeks entry of summary judgment in its favor on Plaintiff's claim for breach of implied warranty of merchantability.   *Def.'s Motion* [#50] at 37-38.

"Unless excluded or modified, a warranty that the goods shall be merchantable is implied in every contract for the sale of goods under Colorado law."   *Platt*, 960 F.3d at 1272 (citing Colo. Rev. Stat. § 4–2–314(1)).   "For goods to be merchantable, they must be fit for the ordinary purposes for which such goods are used."   *Platt*, 960 F.3d at 1272 (citing Colo. Rev. Stat. § 4-2-314(2)(c)).   "[T]o exclude or modify the implied warranty of merchantability or any part of it, the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.'"   Colo. Rev. Stat. § 4–2–316(2).

Defendant argues that summary judgment in its favor is appropriate here because it disclaimed the implied warranty of merchantability as part of its BEPLW, which stated in part: "Bluon disclaims . . . all implied warranties, including warrant[y] of merchantability . . . ."   *Motion* [#50] at 35 (quoting *Ex. A* [#50-1] at 1).   However, because the Court has concluded that entry of summary judgment is inappropriate on the breach of express

warranties claim and a triable issue remains about the terms of any express warranty, the Court may not determine at present whether the implied warranty of merchantability was disclaimed as a matter of law.

Accordingly, Defendant's Motion [#50] is **denied** to the extent Defendant seeks entry of summary judgment in its favor on Plaintiff's claim of breach of the implied warranty of merchantability.

**C.      Breach of Implied Warranty of Fitness for a Particular Purpose**

Defendant seeks entry of summary judgment in its favor on Plaintiff's claim of breach of implied warranty of fitness for a particular purpose. *Def.'s Motion* [#50] at 37-38. Defendant's argument here is identical to its argument concerning Plaintiff's claim of breach of the implied warranty of merchantability. *See id.*

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under section 4–2–316, an implied warranty that the goods shall be fit for such purpose." Colo. Rev. Stat. § 4–2–315.  To exclude the implied warranty of fitness for a particular purpose, the disclaimer must be by a writing and conspicuous.  Colo. Rev. Stat. § 4–2–316(2).

Defendant argues that summary judgment in its favor is appropriate here because it disclaimed an implied warranty of fitness for a particular purpose as part of its BEPLW, which stated in part: "Bluon disclaims . . . all implied warranties, including warrant[y] of . . . fitness for a particular purpose." *Motion* [#50] at 35 (quoting *Ex. A* [#50-1] at 1). However, because the Court has concluded that entry of summary judgment is

inappropriate on the breach of express warranties claim and a triable issue remains about the terms of any express warranty, the Court may not determine at present whether the implied warranty of fitness for a particular purpose was disclaimed as a matter of law.

Accordingly, Defendant's Motion [#50] is **denied** to the extent Defendant seeks entry of summary judgment in its favor on Plaintiff's claim of breach of the implied warranty of fitness for a particular purpose.

### D.    Negligence

Defendant seeks entry of summary judgment in its favor on Plaintiff's negligence claim.  *Def.'s Motion* [#50] at 37-41.

Under Colorado law, "the elements of a negligence claim are that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's injury."  *Ayala v. United States*, 49 F.3d 607, 611 (10th Cir. 1995) (citing *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992)).  Defendant argues that Plaintiff's negligence claim fails as a matter of law because (1) Defendant owed no common law duty to Plaintiff and, (2) even if it did, Defendant is immunized from liability under Colorado's "undertaker" statute, which provides that "a person shall not be deemed to have assumed a duty of care where none otherwise existed when he performs a service or an act of assistance, without compensation or expectation of compensation[.]"  Colo. Rev. Stat. § 13–21–116.

It is undisputed that many of the parties' responsibilities are governed by their various contracts, but Plaintiff does not dispute that "Defendant did not have any contractual duty to install, start-up, design, troubleshoot, or provide any services in connection with Plaintiff's purchase of TdX20 for the Vestas project."  *Def.'s Motion* [#50]

at 38-39; *Pl.'s Response* [#62] at 35 (stating that Defendant "had no express contractual duty to assist in the installation process").  Plaintiff's argument here only addresses the second of Defendant's two arguments, regarding Colo. Rev. Stat. § 13–21–116. *Response* [#63] at 34-37.  Without so holding, the Court notes that it is indeed unlikely that this statute applies here, as Plaintiff argues.  *See, e.g.*, *Messler v. Phillips*, 867 P.2d 128, 133 (Colo. App. 1993) (finding Colo. Rev. Stat. § 13–21–116 to be inapplicable, in part "because defendant's actions did not pertain to 'public safety'"), *disapproved of on other grounds by Resolution Tr. Corp. v. Heiserman*, 898 P.2d 1049 (Colo. 1995)). Regardless, Plaintiff makes no effort to address Defendant's first argument, provides no legal authority to support its contention that Defendant owed Plaintiff a common law duty, and, indeed, provides no clear statement of what that common law duty may even be. *Pl.'s Response* [#62] at 34-37.  Thus, the Court finds that Plaintiff has failed to provide adequate legal or evidentiary foundation for the first element of its claim, i.e., that Defendant owed a duty to Plaintiff, and therefore summary judgment is appropriate on this claim.

Accordingly, Defendant's Motion [#50] is **granted** to the extent that summary judgment shall enter in favor of Defendant and against Plaintiff with respect to Plaintiff's negligence claim.

### E.    Promissory Estoppel

Defendant seeks entry of summary judgment in its favor on Plaintiff's claim for promissory estoppel.  *Def.'s Motion* [#50] at 37.

The elements of a claim for promissory estoppel under Colorado law are "(1) a promise; (2) that [Defendant] reasonably should have expected would induce action or

forbearance by [Plaintiff] or a third party; (3) on which [Plaintiff] or [the] third party reasonably and detrimentally relied; and (4) that must be enforced in order to prevent injustice."  *Wolff v. United Airlines, Inc.*, __ F. App'x __, __, No. 20-1119, 2021 WL 1904864, at *1 (10th Cir. May 12, 2021) (quoting *Pinnacol Assurance v. Hoff*, 375 P.3d 1214, 1221 (Colo. 2016)).

First, it is clear that the factual basis for this claim is the statements made by Defendant about TdX20's capabilities as a "drop-in replacement" for R-22, which Plaintiff asserts are the actionable "promises."  *See, e.g.*, *Pl.'s Response* [#62] at 34 (stating that the claim is based on Defendant's "pre-sale promises about TdX 20").  Defendant argues that Plaintiff's "amended complaint alleges that [Defendant] breached promises relating to the 'qualities and capabilities' of TdX20, which is the same subject of [Plaintiff's] contractual warranty claims," and Plaintiff's "promissory estoppel claim thus fails as a matter of law."  *Motion* [#50] at 37.  Plaintiff responds that "promissory estoppel is a valid alternative theory at the summary judgment stage," because "[p]arties are permitted to pursue a claim for breach of contract and promissory estoppel in the alternative and where the scope of the contract is disputed, summary judgment on the promissory estoppel claim is inappropriate and a jury is permitted to decide between the contract-based claims and the promissory estoppel claim."  *Response* [#62] at 33 (internal quotation marks omitted).  Plaintiff concludes that Defendant's "own arguments attempting to disclaim the express and implied warranties it gave to [Plaintiff] about TdX 20 demonstrate that, at this stage, the scope of the parties' contract—and specifically what warranties arose—are, at a minimum, disputed," hence "the Court should allow [Plaintiff's] promissory estoppel

claim to go to trial because it will be viable if [Defendant's] pre-sale promises about TdX 20 are ultimately not deemed part of the parties' sales contract." *Id.* at 34.

There is undeniable tension between Plaintiff's concession that an enforceable contract was entered and Plaintiff's assertion that promissory estoppel is a viable alternative claim when "the scope of a contract is disputed." *See Pl.'s Response* [#62] at 33. "Recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract." *Malasky v. First Motor Sports, Inc.*, No. 07-cv-00046-JLK, 2008 WL 2095528, at *7 (D. Colo. May 16, 2008) (citing *Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, LLC*, 176 P.3d 737, 741 (Colo. 2007)). "When there has been mutual agreement by the parties on all essential terms of a contract, the alternative remedy of promissory estoppel is never reached." *Malasky*, 2008 WL 2095528, at *7 (citing *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900 (Colo. 1982)).

However, the critical point here appears to be that there was not mutual agreement by the parties on all of the terms of the contract, especially, as explained in detail above, the BEPLW. Nor is there agreement that Defendant's so-called "promises" about TdX 20's capabilities as a "drop-in replacement" for R-22 were part of any contract. In these circumstances, the Court finds that the promissory estoppel claim is viable. *If* the parties' agreement *did not* include these statements as express warranties by Defendant, the law permits the Plaintiff to attempt to recover, in the alternative, for these statements via a claim for promissory estoppel. *See Response* [#62] at 33-34 (citing *Vigoda*, 646 P.2d at 905 (holding that promissory estoppel "should be applied to prevent injustice where there has not been mutual agreement by the parties on all essential terms of a contract"); *Corum Real Estate Grp., Inc. v. Blackrock Realty Advisors, Inc.*, No. 09-cv-01680-DME-

MEH, 2010 WL 1957226, at *8 (D. Colo. May 14, 2010) ("[I]f the alleged promises were not part of any of the contracts' essential terms, Plaintiffs may still have a viable promissory estoppel claim for those promises not covered by the contracts.").  The parties make inadequate arguments about whether the "drop-in replacement" statements were essential terms of the contract, and Defendant has not directed the Court's attention to any cases that illuminate the point.  *See, e.g.*, *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005) ("A material term goes to the root of the matter or essence of the contract.  Materiality must be assessed in the context of the expectations of the parties at the time the contract was formed." (internal citation omitted)).  This case is not like *Malasky*, 2008 WL 2095528, at *7, which stated:

> The parties do not dispute that [the plaintiff] included in the initial draft all of the terms he thought were going to be operative and relevant.  Because the contract contained the essential terms of the agreement, [the plaintiff] cannot rely on promissory estoppel to enforce oral promises which were part and parcel of the written agreement.

Thus, the Court finds that Plaintiff's promissory estoppel claim may proceed as an alternative remedy.  *See Malasky*, 2008 WL 2095528, at *7.

Accordingly, Defendant's Motion [#50] is **denied** to the extent that Defendant seeks entry of summary judgment in its favor with respect to Plaintiff's promissory estoppel claim.

## F.    Unjust Enrichment

Defendant seeks summary judgment in its favor on Plaintiff's unjust enrichment claim, and Plaintiff seeks summary judgment in its favor on Defendant's unjust enrichment counterclaim.

"The elements of unjust enrichment are: (1) at the expense of a plaintiff; (2) a defendant received a benefit; (3) under circumstances making it unjust for the defendant to retain the benefit without paying for it." *In re Application of Thomas Read Mattson*, No. 21-mc-00046-WJM-NYW, 2021 WL 1698929, at *11 (D. Colo. Apr. 29, 2021) (citing *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008)). "The scope of this equitable remedy is broad, 'cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another.'" *Mattson*, 2021 WL 1698929, at *11 (quoting *Robinson*, 179 P.3d at 1007). "It is a form of restitution designed to restore the plaintiff to his or her prior status." *Mattson*, 2021 WL 1698929, at *11 (citing Restatement (First) of Restitution § 1 (1937)).

### 1.    Plaintiff's Claim

Defendant seeks summary judgment in its favor on Plaintiff's unjust enrichment claim. *Def.'s Motion* [#50] at 36. Defendant argues that this claim should be dismissed because "the parties' express contractual warranties cover the same subject matter as [Plaintiff's] quasi-contract claims." *Id.* (citing *Valley Fresh Produce*, 2019 WL 4695668, at *9; *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003); *Am. Compl.* [#6] ¶ 27 ("Neither the November 3, 2016 purchase order nor any other contractual document between Haynes and Bluon contemplated Bluon employees providing installation, start-up, design, or troubleshooting services on the Vestas project, with the limited exceptions stated at the bottom of the purchase order."); *Ex. N, Rule 30(b)(6) Depo. of Pl.* [#50-14] at 145 ("Q. . . . why would Haynes be concerned with that if they were relying on the fact that it was a true drop-in?  A. Again I'd just say

it's due to just a healthy professional skepticism.  And why do we have contracts at all?

Why do we have warranties?  They're here to protect us.")).

Plaintiff responds that Defendant's argument essentially misses the mark as to the

basis of this claim.  *Response* [#62] at 31-32.  Plaintiff states:

> Here, [Plaintiff's] unjust enrichment claim arises independently of the sale contract between the parties and the express and implied warranties thereunder.    [Plaintiff's] unjust enrichment claim alleges that "[i]n unknowingly and unintentionally providing [Defendant] with a 'real world testing' ground for its TdX 20 product and conversion procedures through the Vestas project, [Plaintiff] conferred a benefit on [Defendant]" and that "[b]y using the Vestas project as a 'real world testing' ground for its TdX 20 product and procedures for conversion, [Defendant] accepted the benefit conferred."  [Plaintiff's] summary judgment evidence supports those same allegations.  Nothing in the parties' contract or warranties, express or implied, covers the subject matter of [Plaintiff] conducting real-world testing for [Defendant] on its TdX 20 product through [Plaintiff's] work for its customer, Vestas.  The parties' contract covers only the sale of TdX 20, and the express and implied warranties [Defendant] made about TdX 20 do not address in any way [Plaintiff's] performance of its separate contract with Vestas.  Indeed, nothing about the parties' contract (or warranties) even contemplates [Plaintiff's] work on the Vestas project, which Plaintiff did at its own expense, and to Defendant's benefit.  Accordingly, [Plaintiff's] unjust enrichment claim is not barred by the existence of a basic sales contract or warranties between the parties because it is based on entirely separate conduct by [Plaintiff] conferring a benefit on [Defendant] in field-testing [Defendant's] unproven TdX 20 product, which would be unjust for [Defendant] to retain under the circumstances.

*Id.* (internal citations omitted) (citing, in part, *Am. Compl.* [#6] ¶¶ 86-87; *Ex. A* [#50-1]; *Ex.*

*I* [#50-9]; *Ex. J* [#50-10]; *Ex. K* [#50-11]; *Ex. L* [#50-12]).

The Amended Complaint [#6] can reasonably be read to infer that this claim was

originally based on both Defendant's alleged failure to honor its express and implied

warranties as well the alleged provision of "real world testing" for TdX 20.  *Am. Compl.*

[#6] ¶¶ 84 ("In paying [Defendant] for the faulty TdX 20 product that did not conform to

[Defendant's] express and implied warranties, [Plaintiff] conferred a benefit on

[Defendant].”), 87 ("By using the Vestas project as a 'real world testing' ground for its TdX 20 product and procedures for conversion, [Defendant] accepted the benefit conferred."). With respect to Defendant's warranty argument, Plaintiff makes no argument that the mere failure to abide by express and implied warranties constitutes unjust enrichment and, indeed, therefore appears to have abandoned this aspect of its claim. *See Response* [#62] at 31-32. Thus, in short, Plaintiff has failed to produce evidence supporting this aspect of its unjust enrichment claim, and summary judgment is appropriate in favor of Defendant to the extent that Plaintiff's unjust enrichment claim is based on alleged failure to honor warranties.

In turn, Defendant has made no argument with respect to the "testing" aspect of Plaintiff's claim, and therefore Plaintiff is under no obligation to produce evidence in support of this part of its claim. *See, e.g.*, *Jewell v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-02536-KLM, 2020 WL 1627348, at *5 (D. Colo. Feb. 26, 2020) (holding that the "[p]laintiff is not required to respond to an argument which was not directly made in" the defendant's motion for summary judgment") (citing *Stoole v. Metro. Prop. & Cas. Ins. Co.*, No. 17-cv-00613-NYW, 2018 WL 4923939, at * (D. Colo. Oct. 10, 2018) (noting that the plaintiff  was not required in a response to a motion for summary judgment to provide evidence where the defendant failed to argue in the briefing that the plaintiff lacked that evidence)).

Accordingly, Defendant's Motion [#50] is **granted** to the extent Defendant seeks summary judgment in its favor on the "warranties" portion of Plaintiff's unjust enrichment claim. Defendant's Motion [#50] is **denied** to the extent Defendant's Motion could be construed to request summary judgment on the remaining "testing" portion of this claim.

2.    **Defendant's Counterclaim**

Plaintiff argues that summary judgment is appropriate on Defendant's unjust enrichment counterclaim because, under the voluntary payment doctrine, Defendant "cannot now recover from [Plaintiff] the costs it incurred for the EEV exchange because it incurred those costs voluntarily, and in furtherance of satisfying its customer and its own [research and development] for its new refrigerant. The same is true of all of the labor, materials, and other expenses [Defendant] incurred in working through the HVAC conversion at Vestas." *Pl.'s Motion* [#49] at 13-14.

The voluntary payment "rule is a defense to claims asserting unjust enrichment." *Skyland Metro. Dist. v. Mountain W. Enter., LLC*, 184 P.3d 106, 127 (Colo. App. 2007). This rule "provides that where one makes a voluntary payment with knowledge of all relevant facts, and then sues to recover that payment, there generally can be no recovery, even if there was no legal liability to pay in the first place." *Id.* "However, the payor can defeat application of the rule by showing payment under protest or duress or a mistake as to all relevant facts." *Id.*

Defendant's response asserts that "there are serious factual questions about whether [Defendant] provided its services to [Plaintiff] with knowledge of all relevant facts to determine if it wanted to continue." *Response* [#58] at 20. Defendant states that, at the time when Defendant provided its services to Plaintiff, "[Plaintiff] never provided proper notice to [Defendant] that it believed [Defendant] was breaching certain warranties," and Defendant had no "idea that [Plaintiff] was treating working with [Defendant] to correct issues as a 'real world [research and development]' project for which it would be charged exorbitant rates," i.e., "[h]ad [Defendant] known it would be

blindsided with million-dollar invoices and threats of expensive litigation, it may have made different business decisions." *Id.* Defendant also asserts that, "although it provided its services as a volunteer with no expectation of payment, it may still maintain a cause of action in Colorado for unjust enrichment as expectation of payment is not a necessary element of the claim." *Id.*

Defendant concedes that "it acted as a good faith volunteer" with respect to the work it provided, but it has provided no legal authority or evidence to support its argument that the voluntary payment doctrine is inapplicable to the circumstances of this case. "Money paid under a mistake of law, which typically involves 'a failure to appreciate the effect or consequences of a recognized law,' cannot be recovered." *Skyland Metro. Dist.*, 184 P.3d at 130. Thus, to the extent Defendant's argument hinges on its beliefs regarding whether it may or may not have been liable for potential warranty breaches or otherwise, this argument fails. In addition, Defendant has provided no evidence regarding how its decisions may have been altered by any of the facts it purportedly did not know, beyond saying, without support, that "it may have made different business decisions." *Response* [#58] at 20. The Court also notes that it is aware of no legal authority holding that a mistake of fact can be based on *future* events. Defendant directs the Court's attention to no evidence that Plaintiff was actively anticipating litigation at the time Defendant decided to voluntarily provide its services. Thus, the Court finds that the voluntary payment rule applies here, and that summary judgment in favor of Plaintiff is appropriate on this counterclaim. *See Skyland Metro. Dist.*, 184 P.3d at 130 ("Because of our conclusion[ ] that the developers' claims for unjust enrichment were barred by the voluntary payment

rule . . . we need not consider the developers' contention that they were entitled to judgment on the merits of their unjust enrichment claim.").

Accordingly, Plaintiff's Motion [#49] is **granted** to the extent that summary judgment shall enter in favor of Plaintiff and against Defendant on Defendant's unjust enrichment counterclaim.

## G. Special Damages

Defendant generally concedes that Plaintiff may seek to recover actual labor and material costs caused by TdX 20, but Defendant argues that other categories of damages sought by Plaintiff are not recoverable because they are special damages. *Motion* [#50] at 41-43. According to the pre-litigation invoice Plaintiff provided to Defendant for Plaintiff's purported costs, Plaintiff seeks $1,067,634 (not including taxes on materials) as follows: (1) $272,855 in lost opportunity costs, consisting of $145,593 for "[h]ours behind on PM"[11] and $127,262 for "[l]ost opportunity for [time and materials]," and (2) $794,779 in direct costs, consisting of $93,600 for 624 hours of "[a]dditional [s]upervision [c]ost," $50,000 for 200 hours of "[e]ngineering [c]ost," and $651,179 for 4,193 hours of "[f]ield [c]ost (labor and materials)." *Ex. T* [#50-20] at 2.

Special damages depend on the particularities of the case, whereas general damages are the ordinary result of the alleged breach. *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1266 (10th Cir. 2007); *see also In re Ardent, Inc.*, 305 B.R. 133, 138 (Bankr. D.D.C. 2003) (stating that "indirect, special or consequential damages" are "terms that all mean the same thing: the opposite of general or direct damages"); *In re CCT*

---

[11]   The parties do not appear to define "PM" anywhere, but the definition is not material for resolution of the Motion [#50].

*Commc'ns, Inc.*, 464 B.R. 97, 117 (Bankr. S.D.N.Y. 2011) (stating that "'[c]onsequential,' 'special' and 'indirect' damages are synonymous terms").

Defendant's argument here partially relies on its notice argument, stating that "giving a $1 million+ bill to a refrigerant manufacturer after it assisted Haynes over a year, ***spending more than twice as much as it made on the sale of TdX20 to Haynes***, is not reasonable notice that entitles Haynes to damages under the Colorado Commercial Code." *Motion* [#50] at 42-43 (emphasis in original).  As the Court has already held above in Section III.A., there is a genuine issue of material fact as to whether Plaintiff gave reasonable notice to Defendant of the alleged warranty breach(es), and therefore entry of summary judgment regarding special damages is not appropriate based on this argument.

Defendant's argument here also partially relies on whether Defendant's standard warranty document was part of the contract, stating that "the [BEPLW] disclaimed all damages other than parts and labor costs pursuant to the warranty agreement."  *Motion* [#50] at 42.  Again, as the Court has held above, there is a genuine issue of material fact as to whether the terms of Defendant's standard warranty document were incorporated into the contract, and therefore the Court may not enter summary judgment regarding special damages based on this argument.

Defendant also argues that Plaintiff's "claims for 'supervisor' time and 'engineering cost' are actually just additional consequential damages masquerading as direct cost," and that "[t]hese are special, consequential damages that are not pleaded and are disclaimed."  *Motion* [#50] at 43 (without citation to legal authority).  Similarly, Defendant argues that Plaintiff may not recover its lost opportunity costs because the Amended

Complaint [#6] does not include those damages. *Id.* at 42 (citing Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated."); *Border Bolt Co. v. Twin City Fire Ins. Co.*, 149 F.3d 1190 (10th Cir. 1998) ("It is therefore the *facts* pleaded in the complaint that control, not the mere mention of consequential damages." (emphasis in original))).

Normally, when special damages are not an element of a claim, but merely sought in addition to the plaintiff's claim for general damages, Rule 9(g) works to ensure that the defendant has notice of the "unusual damages being sought by virtue of their alleged wrongdoing." *DerKevorkian v. Lionbridge Techs., Inc.*, No. 04-cv-01160-LTB-CBS, 2006 WL 197320, at *4 (D. Colo. Jan. 26, 2006); *see also* 5a Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1311 (4th ed. 2008) ("A strict approach to the application of Rule 9(g) has little justification when special damages are sought simply as a supplement to the plaintiff's general damages, as long as the pleading has satisfied the rule's underlying notice function.").

Here, there is no dispute that Plaintiff is seeking general damages as well as special damages, and there appears to be no dispute that Defendant was on notice of the requested special damages throughout the course of this litigation. *See, e.g.*, *Ex. A, Depo. of Hermanson* [#62-1] at 208:22-242:22; *Ex. B, Rule 30(b)(6) Depo. of Pl.* [#62-2] at 249:19-303:13; *Ex. P, Pl.'s Initial Disclosures* [#62-16] at 5; *Ex. Q, Depo. Ex. 106* [#62-17]; *Ex. R, Depo. Exs. 158-160* [#62-18]; *Ex. T* [#50-20] at 2 (Plaintiff's invoice of damages given to Defendant on December 17, 2017, prior to the start of this litigation).

Thus, the Court finds that Defendant received proper notice of Plaintiff's special damages and suffered no prejudice even if Plaintiff's alleged special damages were not

pled with specificity in the Amended Complaint [#6]. Defendant's argument therefore fails, and summary judgment is inappropriate on this issue. *See, e.g.*, *Wilmington Tr., N.A. v. Estate of Gonzalez*, No. 15-CV-23370-UU, 2016 WL 11656681, at *10 (S.D. Fla. Nov. 1, 2016) (denying summary judgment on damages because any pleading deficiency under Fed. R. Civ. P. 9(g) was neither prejudicial nor a surprise where the nonmoving party disclosed its claimed damages both in initial disclosures and "throughout discovery," and holding "the requirement in Rule 26(a)(1)(C) on initial disclosures, including for damages, has nullified the purpose of Rule 9(g) somewhat") (internal quotations and citations omitted).

Accordingly, Defendant's Motion [#50] is **denied** to the extent Defendant asks the Court to enter summary judgment in its favor that Plaintiff cannot recover certain damages.

### IV. Conclusion

IT IS HEREBY **ORDERED** that Plaintiff's Motion [#49] is **GRANTED in part and DENIED in part**. This Motion [#49] is **granted** to the extent that summary judgment shall enter in favor of Plaintiff and against Defendant on Defendant's unjust enrichment claim. This Motion [#49] is **denied** to the extent Plaintiff seeks entry of partial summary judgment on Plaintiff's breach of express warranties claim.

IT IS FURTHER **ORDERED** that Defendant's Motion [#51] is **GRANTED in part and DENIED in part**. This Motion [#51] is **granted** to the extent that summary judgment shall enter in favor of Defendant and against Plaintiff on (1) Plaintiff's negligence claim, and (2) the "warranties" portion of Plaintiff's unjust enrichment claim. This Motion [#51] is **denied** to the extent that Defendant seeks entry of summary judgment on (1) Plaintiff's

breach of express warranties claim, (2) Plaintiff's breach of the implied warranty of merchantability claim, (3) Plaintiff's breach of the implied warranty of fitness for a particular purpose claim, (4) Plaintiff's promissory estoppel claim, (5) the "testing" portion of Plaintiff's unjust enrichment claim, and (6) Plaintiff's special damages.

Dated:  July 23, 2021

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge